Jesse I. ETELSON, Appellant,

v.

OFFICE OF PERSONNEL MANAGE-
MENT, et al., Appellees.

No. 81–1259.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 11, 1982.

Decided June 29, 1982.

Jesse I. Etelson, pro se.

Patricia J. Kenney, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty. at the time the brief was filed, Royce C. Lamberth

and Kenneth M. Raisler, Asst. U. S. Attys., Washington, D. C., were on the brief for appellees. Michael J. Ryan, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellees.

David Colangelo, President, National Labor Relations Board Professional Ass'n, Washington, D. C., entered an appearance on the docket, and filed a brief for amicus curiae, National Labor Relations Board Professional Ass'n.

Before MacKINNON, Circuit Judge, McGOWAN, Senior Circuit Judge, and NORTHROP *, United States Senior District Judge for the District of Maryland.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

Opinion concurring in part and concurring in the result filed by Circuit Judge MacKINNON.

McGOWAN, Senior Circuit Judge:

This appeal from the District Court presents a challenge to the method used by the Office of Personnel Management (OPM), formerly the Civil Service Commission (CSC), in evaluating candidates for administrative law judge (ALJ) positions. Appellant Jesse Etelson brought this action after applying unsuccessfully for certification as eligible for a GS–16 ALJ position. He challenged (1) OPM's system of assigning "quality points" to government lawyers solely on the basis of their grade level while evaluating the actual litigating experience of private attorneys, and (2) certain "factor ratings" assigned to his application, based on confidential evaluations of his abilities. The District Court granted summary judgment for OPM, finding that (a) Mr. Etelson had not raised his first issue during the administrative proceedings, and (b) his second issue lacked merit.

We affirm the District Court's decision that the second issue, the alleged arbitrariness of the "factor ratings," should be resolved in favor of OPM. We determine, however, that Mr. Etelson did not inexcus-

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

ably fail to raise before the agency the issue of discrimination between private practitioners and government attorneys. We further find that the record before us demonstrates such discrimination, and that nothing in the record could support a conclusion that the discrimination was rational.

Mr. Etelson, however, has not shown that, at this time, he should be adjudged eligible for an ALJ position. He has, however, amply demonstrated that his application should be evaluated on the basis of criteria analogous to those applied to private practitioners. Accordingly, we return the case to the District Court for remand by it to OPM with directions to allow Mr. Etelson to update his application, and thereafter to evaluate his application in a way that does not arbitrarily discriminate between public and private attorneys.

## I. BACKGROUND

In 1970 Etelson, then a GS–13 attorney with the National Labor Relations Board (NLRB), applied to the CSC for certification as eligible to become an ALJ[1] at a GS–15 grade level or higher. CSC Announcement No. 318 at the time required a government attorney applicant to show that he had experience at "a level of difficulty, complexity, responsibility, and importance characteristic of at least the next lower grade in the Federal service." App. 138–39.[2] Etelson had no experience as a GS–14 when he applied, but he argued that his experience had been "characteristic" of that level. He added:

> I would submit, furthermore, that judging the level of experience by the GS level at which it was performed would be the equivalent of judging the level of experience of a private attorney by his salary or income. If this method were used in applications evaluations of private attorneys I should point out that in my capacity of attorney in the Appellate Court Branch, the private attorneys rep-

resenting the other side in my cases, doing work comparable to mine, probably averaged twice my income. If, on the other hand, the level of qualifying experience of a private attorney is judged through evaluation of the intrinsic importance and quality of his work, fairness and parity require that the same be done in the case of a government attorney.

A.R. 432. His application was denied by the Office of Hearing Examiners on April 29, 1971 because he lacked GS–14 experience when he applied. Etelson appealed to the CSC's Board of Appeals and Review, which rejected his appeal on August 17, 1971, with the following explanation:

> In addition, with regard to the procedures for determining qualifying experience, it is noted that Announcement No. 318 contains different bases for determining quality of experience, i.e., (1) consideration of the grade level for Federal employees and (2) quality of experience for attorneys engaged in trial practice.

> In other words, Announcement No. 318 separately describes what constitutes qualifying experience for Federal employees and what constitutes such experience for those engaged in trial practice. Such discussion regarding Federal employees, as noted above, correlates qualifying experience to grade level.

> . . . .

> The Board of Appeals and Review concludes that on the basis of its overall review of the application file in relation to the rating schedule established and uniformly applied, the rating of ineligibility was correct.

A.R. 421.

After the CSC amended Announcement No. 318 to provide exceptions to the "next-lower-grade" rule, Etelson updated his application in 1973. He was specifically advised that "[t]he material you previously submitted will be combined with the con-

---

1. ALJ's were at the time called "hearing examiners."

2. "App." refers to the appendix to appellant's brief. See Fed.R.App.P. 30. "A.R." refers to the administrative record. "R." refers to the numbered documents in the District Court record.

tents of the new application ... and our determination would be based on the total record thereof." App. 93. The CSC evaluated Etelson's updated application on a 100-point scale consisting of 60 possible "quality points" for the level of an applicant's litigating experience, and 40 possible "factor rating" points for various demonstrated abilities, gauged on the basis of confidential questionnaire responses from people familiar with the applicant's work.

At the time of his updated application, Etelson was a GS–14 legal assistant to an NLRB member. After ascertaining that Etelson had at least four years of litigating experience, the CSC assigned him 55 quality points toward certification as eligible to be a GS–15 ALJ, and 50 quality points toward a GS–16 position. App. 130. Given Etelson's litigating experience, the assignment of these point values was automatic based on his GS–14 level. App. 98, 101. Etelson's application showed, however, that he had at least a year of recent experience litigating in United States Courts of Appeals. This showing would have entitled a private practitioner to 60 points toward both GS–15 and GS–16 eligibility, see infra p. 926, although Etelson could not have known this at the time, see infra pp. 924–25.

Etelson was awarded 28 of a possible 40 factor rating points based on the evaluation by 14 confidential "witnesses" of his abilities.[3] In three of the four groups of factors used by the CSC, he was given points in the "outstanding" range. In Group II, which deals with presentation of cases before courts and agencies, he was rated "better than adequate." Although witnesses expressing an opinion on the Group II factors rated Etelson outstanding by a two-to-one ratio, between five and eight witnesses had no opinion on each of the Group II factors. One witness, whose observations were accorded great weight by the CSC because he or she "observed the applicant at close

range for the preceding several years," App. 154, rated Etelson "adequate" on all Group II factors. App. 36.

Etelson's resulting "basic rating" was 78 for a GS–16 position and 83 for a GS–15 position. The CSC's cut-off for eligibility was 80 points, so Etelson was allowed to proceed with the remaining portion of the examination [4] but was advised on May 8, 1974 that he was only eligible at the GS–15 level. App. 53. He appealed the denial of GS–16 eligibility to the Board of Appeals and Review, the same body that had denied his first appeal. His letter of appeal stated: "I wish to have the entire record reviewed, but ask for specific consideration of the fact that, as I have been informed, no credit has been given for my professional publications." App. 44. The agency denied the appeal in a written decision containing a lengthy discussion of Etelson's claim that his publications were not adequately considered. It also stated that the appeals board had "given thorough and careful consideration to the entire record," App. 41, and that

> the present rating method was implemented on the basis of the examination procedures adopted by the Commission, and ... it is uniformly applied to all candidates for the examination. The Board is of the opinion that, when properly implemented, the procedure being used, while not perfect, is fair and equitable, and is geared to obtain the best candidates for Administrative Law Judges. App. 42.

Unable to obtain what he sought from the executive branch, Etelson next turned to the legislative. In a July 1975 letter to Senator Jennings Randolph, Etelson renewed his comparison between public and private attorneys:

> I cannot see where any interest is served, save the dubious one of relieving the Commission of the burden of making

---

**3.** The 14 witnesses were 10 people Etelson had listed as familiar with his qualifications, two people whom he had listed as connected with cases on which he had worked, and two others selected by the CSC. All 14 witnesses were sufficiently familiar with Etelson's abilities to

evaluate him in at least three of the four groups of factors considered by the CSC. App. 36.

**4.** This consisted of a demonstration of writing ability and an oral interview. App. 143–44.

real determinations, by having Administrative Law Judges qualified on the basis of their existing positions instead of their functions and accomplishments. Were this criterion applied to private attorney applicants the inquiry presumably would be limited to the applicant's earnings and, perhaps, whether he or she is a partner. A.R. 46. This letter was forwarded to Congressman Gilbert Gude and then to Director Charles Dullea of the CSC Office of Administrative Law Judges. Mr. Dullea wrote back to Congressman Gude that Etelson had been evaluated under uniform standards and that none of various studies of the CSC's ALJ program "provide[d] any support for the concern expressed by Mr. Etelson." A.R. 47–48.

Etelson next requested from the CSC, in 1977, certain records relevant to his application, pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (1976). On the basis of documents released by the CSC,[5] Etelson sought in March 1978 to reopen his case, arguing again that the CSC's treatment of government attorneys was irrational and citing the decision on his first appeal to the Board of Appeals and Review. App. 33–34 & n.*. The CSC on April 11, 1978 denied the request to reopen and stated: "You have exhausted your administrative appeal rights within the Commission and your case is considered to be closed." App. 11.

On April 9, 1979, Etelson resorted to the judicial branch, filing a suit in the District Court that challenged the agency's denial to him of GS–16 eligibility. The Government filed the entire administrative record, making it available to Etelson for the first time. The court denied a motion by the Government to dismiss because of laches or for summary judgment, and ordered discovery. After discovery, Etelson and the Government cross-moved for summary judgment. Etelson argued that the quality-point system for government attorneys was irrational because it irrebuttably determined quali-

ty of experience from grade level and because it discriminated between government and private lawyers. R. 30 at 7–8 & nn.6, 8. He also attacked as arbitrary the factor ratings assigned him. *Id.* at 8–11. The Government argued that the court lacked jurisdiction, that the action was barred by laches, that the agency action was not so irrational as to violate the fifth amendment, and that the agency action was not arbitrary or capricious. R. 35 at 4–10. In the introduction to its memorandum in support of summary judgment, the Government stated in passing that Etelson sought to "challenge an agency determination on a new basis not previously advanced in the administrative appeal process." *Id.* at 2 (footnote omitted).

The District Court heard argument on the cross-motions and, on January 28, 1981, granted the Government's motion in an unpublished memorandum. The court determined that it had jurisdiction. App. 5. As to quality points, the court declared: "this issue of discrimination between federal and private practitioners was never raised during the course of the administrative determination on review here.... Since the CSC thus had no opportunity to consider this issue, this Court is also precluded from such consideration." App. 8. The court upheld the factor ratings on the merits. Etelson appealed to this court, and the case has been briefed and argued.

## II. QUALITY POINTS

█ At the threshold, the Government reasserts that the District Court lacked jurisdiction. We reject this contention. Contrary to the Government's assertion that Etelson "has not cited any statute or regulation which has been violated," Brief for Appellees at 11 n.7, Etelson asserts straightforwardly that a federal agency has acted arbitrarily and capriciously in contravention of Administrative Procedure Act § 10(e)(2)(A), 5 U.S.C. § 706(2)(A) (1976). The District Court therefore had federal

---

**5.** The CSC initially refused to release the documents. Etelson sued, and the suit was settled in 1978 by release of the documents, although the CSC did not concede that release was required.

question jurisdiction. *See* 28 U.S.C.A. § 1331 (West Cum.Supp.1982).[6] We turn, therefore, to the ground on which the District Court rejected Etelson's quality-point claim: the alleged failure to exhaust administrative remedies by raising the claim before the CSC.

### A. *Exhaustion of Administrative Remedies*

■ A unanimous Supreme Court long ago made clear that a reviewing court will generally not address issues not raised before an agency, for the "court usurps the agency's function when it sets aside the administrative determination on a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Unemployment Compensation Commission v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946). But the Court was also unanimous when it declared in *Hormel v. Helvering*, 312 U.S. 552, 556–59, 61 S.Ct. 719, 721–22, 85 L.Ed. 1037 (1941), that this rule was not to be given a "rigid and undeviating" construction. It is now beyond dispute that the exhaustion doctrine is to be applied flexibly, with an eye toward its underlying purposes.[7] *See, e.g., McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969); *National Treasury Employees Union v. Kurtz*, 636 F.2d 411, 413–14 (D.C.Cir.1980) (Bazelon, J., dissenting); *Action for Children's Television v. FCC*, 564 F.2d 458, 469 (D.C.Cir.1977); *Consumers Union of United States v. Cost of Living Counsel*, 491 F.2d 1396, 1399 (Temp. Emer.Ct.App.), *cert. denied*, 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1974); *Board of Public Instruction v. Finch*, 414 F.2d 1068, 1072 (5th Cir. 1969). *See generally* 3 K. Davis, *Administrative Law Treatise* § 20.-06, at 92 (1958); Fuchs, *Prerequisites to Judicial Review of Agency Action*, 51 Ind. L.J. 817, 864, 908 (1976).

This court has emphasized that "[t]he purpose of exhaustion ... is narrow .... So long as the appellant or some other party has put an objection on the record, the obligation to exhaust is discharged." *Safir v. Kreps*, 551 F.2d 447, 452 (D.C.Cir. 1977). Furthermore, counsel for OPM never asserted before the District Court (except in a perfunctory and oblique manner) that Etelson had in any way failed to exhaust his administrative remedies. This strongly suggests that OPM considered itself to have rejected finally all of Etelson's contentions, and it counsels us against a contrary determination. *See Weinberger v. Salfi*, 422 U.S. 749, 766–67, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975). *See generally* 3 K. Davis, *Administrative Law Treatise* § 20.13 (Supp.1982).

■ With these principles in mind, we think it clear that Etelson should not be ousted from court on exhaustion grounds. Three factors, taken together, suggest that he should be able to raise here his claim of discrimination between government and private attorneys: (1) he raised a form of this claim before the agency; (2) he could not have raised the claim in its present form before the agency; and (3) the agency has demonstrated its disinclination to respond favorably to this claim. These factors are discussed below. We do not decide that any one of these factors alone would suffice to allow Etelson to raise his claim in court, but in combination they overwhelmingly favor judicial review of the claim.

1. *Etelson raised a form of his discrimination claim before the agency.*—In 1971, Etelson argued to the CSC that its system for assigning quality points to government lawyers was irrational because "fairness and parity" required similar systems to be applied to government and private attor-

---

**6.** We do not reach on the merits any questions of mandamus or constitutional rights. We therefore need not examine the jurisdictional bases for any such claims.

**7.** The doctrine is indeed so flexible that some assert it to be, at least in part, a matter of

judicial discretion. *See, e.g.,* 3 K. Davis, *Administrative Law Treatise* § 20.01, at 446 (Supp.1976); Fuchs, *Prerequisites to Judicial Review of Agency Action*, 51 Ind.L.J. 817, 908 (1976).

neys. The agency simply responded that "Announcement No. 318 contains different bases for determining quality of experience." *See supra* p. 920. His subsequent application, whose rejection in 1974 is on review here, was not a new application, but an updated application. Etelson did not explicitly press his previously rejected discrimination claim in 1974, but he asked that the entire record be reviewed, and the agency gave consideration to the entire record. *See supra* p. 921.

"So long as the appellant . . . has put an objection on the record, the obligation to exhaust is discharged." *Safir v. Kreps*, 551 F.2d 447, 452 (D.C.Cir.1977). Furthermore, "there can be no doubt that . . . every party has had adequate notice of [Etelson's] contentions," *id.* at 453, that there was unjust discrimination between government and private attorneys. These contentions were not only presented directly to the agency in 1971 and renewed (albeit without emphasis) in 1974, but also they were urged on the agency by Members of Congress who forwarded Etelson's letters in 1975. *See supra* pp. 921–922. Between 1975 and 1979 the agency was made well aware of Etelson's general dissatisfaction with the process,[8] and Etelson has again pursued diligently his discrimination claim since filing suit in 1979.

We have held in the past that when an agency has enforced a requirement against an applicant, it "not only had an opportunity to . . . pass on the validity of the [requirement] . . . but it also had an obligation to do so." *Way of Life Television Network v. FCC*, 593 F.2d 1356, 1359 (D.C.Cir.1979). We went on to hold that "the Commission acted in an arbitrary and capricious manner," *id.* at 1360, by applying an invalid cutoff date for applications. The present case is an even stronger one for gauging the CSC's application of its policy to Etel-

son against the arbitrary and capricious standard, for Etelson has made his objections to that policy known.

2. *Etelson could not have raised his claim in its present form before coming to court.*—Etelson's present claim is more carefully defined than the one he took up with the CSC in 1971, 1974, and 1975. He now asserts not only that it is irrational to apply different standards to private and public attorneys, but also that had he been evaluated under the standards applied to private lawyers he would have received a specific, higher rating: 60 quality points toward eligibility at both the GS–15 and GS–16 levels. This claim, in this form, was never presented to the agency for decision.

■ The claim was not presented to the agency because Etelson could not know how the agency evaluated private attorneys until September 14, 1979, when the administrative record was filed in the District Court as part of this lawsuit. A complainant is justified in airing an issue for the first time in court when he "could not know exactly how, or upon what," the agency based its conclusions. *Deep South Broadcasting Co. v. FCC*, 347 F.2d 459, 464–65 (D.C.Cir.1965). Discovery of a new basis for objection to agency action presents a classic case for excusal of a failure to raise that issue before the agency. *See Hormel v. Helvering*, 312 U.S. 552, 558–59, 61 S.Ct. 719, 722, 85 L.Ed. 1037 (1941); *Way of Life Television Network v. FCC*, 593 F.2d 1356, 1358 (D.C.Cir.1979); 3 K. Davis, *Administrative Law Treatise* § 20.06, at 92–94 (1958); Fuchs, *supra* note 7, at 870. In such circumstances, "the reviewing court has discretion to decide the matter itself or to remand it to the [agency] for further consideration." *NLRB v. Jones & Laughlin Steel Corp.*, 331 U.S. 416, 428, 67 S.Ct. 1274, 1281, 91 L.Ed. 1575 (1947).

---

**8.** We note, in this regard, that the agency raised laches as a defense below but urges that defense only briefly here. *See* Brief for Appellees at 18 n.11. Mr. Etelson's constant eleven-year effort to seek relief from all three branches of government hardly presents a case of someone who has sat on his rights. The di-

rector of the CSC Office of Administrative Law Judges himself noted in 1978 that "a rejection of the request to re-open because of a lack of diligence . . . may, in the light of [Freedom of Information Act] efforts, be a little weak." App. 12.

In this case, the agency has always been aware of how it would have evaluated Etelson's application were he a private practitioner; Etelson's unawareness of this stemmed from "ignorance . . . to which the agency may have contributed," Fuchs, *supra* note 7, at 910; *cf. Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 394–95 (D.C.Cir.1973) ("belated disclosure" by agency). For this reason, and because the agency would not likely afford Etelson relief were we simply to remand for consideration, we exercise our discretion to reach the issue here.[9]

■ 3. *The agency has demonstrated that it is unlikely to afford Etelson relief.* —Perhaps the clearest indication of the agency's determination not to change its policies appears in a 1975 letter to Congressman Gude:

> In a program that involves the examination and evaluation of several hundred applications yearly, submitted by attorneys in Federal, state and local bodies as well as in private practice, criticisms have been heard. However, I should note that the procedures followed in this program were devised after a broad study conducted by an Advisory Committee (made up of a number of specialists, including the

former Chairman of the National Labor Relations Board and outstanding private practitioners). Additionally, the program has been reviewed from time to time by Committees of the Administrative Conference of the United States, interested bar associations and other organizations. None of these studies, which have touched all phases of the program, provides any support for the concern expressed by Mr. Etelson.

A.R. 48. When an agency has committed itself not to change its rules unless judicially compelled to do so,[10] has made known that its general views are contrary to those of the complainant,[11] and has never given an inkling that it would consider a matter afresh,[12] and when the regulations in question have received careful attention within and outside the agency,[13] a complainant need not make a *pro forma* request that the agency redo its system.

We are aware that courts have been inconsistent in applying the "futility" exception to the exhaustion rule. *See generally* 3 K. Davis, *Administrative Law Treatise* § 20.07 (Supp.1976). We are also aware that this exception is subject to abuse, and for this reason we do not decide that, standing alone, the apparent futility of Mr. Etel-

**9.** We recognize that, in one regard, this is a close case on the question of exhaustion. It is a commonplace of administrative law that an agency action is to be upheld on the basis on which the agency acted or not at all. *See, e.g., SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). The exhaustion doctrine furthers this principle by ensuring that an agency always has an opportunity to justify its action. In the present case, as we note at *infra* p. 927, the record and briefs are utterly devoid of any justification by the agency for its disparate treatment of government and private applicants.

We think this an inappropriate case for such a remand, however. The agency had ample *opportunity* to provide a justification for its policy when Mr. Etelson challenged it in 1971, 1974, and 1975. It has also had occasion to justify its policy through litigation counsel in the District Court and on this appeal. We even suggested at oral argument reasons that the agency might have relied on in setting up its system, yet Government counsel did not adopt any of these reasons, instead arguing that disparate treatment did not exist.

We usurp the agency's function when we overturn a decision as arbitrary and capricious without giving the agency a chance to justify it. We do not intrude on agency prerogatives when, as in this case, we set aside action that the agency has chosen not to justify.

**10.** *See Humana of South Carolina, Inc. v. Califano*, 590 F.2d 1070, 1081 (D.C.Cir.1978); *National Treasury Employees Union v. Kurtz*, 636 F.2d 411, 417 (D.C.Cir.1980) (Bazelon, J., dissenting); *Consumers Union of United States v. Cost of Living Council*, 491 F.2d 1396, 1400 (Temp.Emer.Ct.App.), *cert. denied*, 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1974); Fuchs, *supra* note 7, at 909.

**11.** *See Action for Children's Television v. FCC*, 564 F.2d 458, 469 (D.C.Cir.1977).

**12.** *See Board of Educ. v. Harris*, 622 F.2d 599, 607 (2d Cir. 1979).

**13.** *See McKart v. United States*, 395 U.S. 185, 206–07, 89 S.Ct. 1657, 1669, 23 L.Ed.2d 194 (1969) (White, J., concurring in the result).

son's further resort to the CSC would allow him to raise his claim here. But this is hardly a case of "deliberate flouting of administrative processes," *McKart v. United States*, 395 U.S. 185, 195, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969), and we are confident that the three factors we have discussed, taken together, make Etelson's discrimination claim an appropriate one for resolution at this time.

### B. *Arbitrariness and Capriciousness*

■ Having decided that the District Court erred in not reaching this issue on exhaustion grounds, we could remand this case to the District Court to address the merits in the first instance. Such a remand would serve no purpose, however, for whatever the District Court did on remand, this court would on any subsequent appeal take "a fresh look at the record and [make] an independent judgment based thereon." *Polcover v. Secretary of the Treasury*, 477 F.2d 1223, 1226 n.5 (D.C.Cir.1973). The District Court record is complete, the case was resolved below on cross-motions for summary judgment, and the parties have briefed the merits in this court. *Cf. Murray v. Buchanan*, 674 F.2d 14, 16 n.5 (D.C.Cir.1982) (remanding for development of "a more complete record" a case dismissed by the District Court on threshold grounds), *vacated for rehearing en banc* (May 25, 1982). We therefore reach the merits.[14] *See Commissioner v. Gordon*, 391 U.S. 83, 95 n.8, 88 S.Ct. 1517, 1524 n.8, 20 L.Ed.2d 448 (1967).

1. *The record demonstrates that Etelson would have received 60 quality points had he been a private practitioner.*—Government counsel urged strenuously in the briefs and at oral argument that because Mr. Etelson was not evaluated as a private attorney, the record does not show what ratings he would have received had he been so evaluated. We cannot agree.

Citing App. 103, a page from the rating schedule for the competitive examination for hearing examiners, Government counsel contends that a private law practitioner would have received the same number of quality points as Etelson. But that page applies only to one in "[g]eneral law practice" with "a significant proportion" of cases in any of a wide-ranging list of courts and agencies. Far more specific is App. 108, a page from a supplement to that rating schedule. That page indicates that a private attorney practicing predominantly in the United States Court of Appeals for the District of Columbia Circuit would receive 60 quality points toward eligibility at both the GS–15 and GS–16 levels. More specific still are the Government's answers to certain interrogatories propounded by Mr. Etelson. A private practitioner demonstrating "that a preponderance of his case work was before the courts of appeals ... would be assigned points at the 'A' quality level [*i.e.*, 60 points] for qualification ... at both the GS–15 and GS–16 levels." R. 28 at 5. In rating private practitioners, the CSC "does not attempt to evaluate the characteristics of the individual cases, but rather the level of the forum in which the cases are tried." *Id.* at 10.[15]

Mr. Etelson's 1973 application showed that he had spent the preceding year appearing exclusively in United States Courts of Appeals. He would, therefore, have received 60 quality points toward GS–16 certification, rather than the 50 he actually received, if he had been a private attorney.

■ 2. *The different treatment accorded government and private attorneys is arbitrary and capricious.*—Government is at its most arbitrary when it treats similarly situated people differently. In *Haneke v.*

---

**14.** We have expressed in the past our reservations about a Congressional scheme of agency review in which the District Court and the Court of Appeals perform identical functions. *See, e.g., Polcover v. Secretary of the Treasury*, 477 F.2d 1223, 1225–28 (D.C.Cir.1973); cases cited in *id.* at 1227–28.

**15.** Certain interrogatory responses, pertaining to "recognized outstanding specialists" practicing before administrative agencies, were amended after these answers were filed, but the answers quoted in text were not amended. Mr. Etelson did not practice before administrative agencies and never claimed to be a recognized outstanding specialist.

*Secretary of Health, Education & Welfare,* 535 F.2d 1291 (D.C.Cir.1976), we returned a case to the CSC because "it is clear that the Commission was arbitrary and capricious in refusing even to consider whether it was applying two labels to the same work." *Id.* at 1299. It is just as arbitrary to assign two numbers to the same work.

The remaining question, therefore, is whether government and private attorneys with identical experience—a year of litigation predominantly in federal Courts of Appeals—do the same work. We have little difficulty agreeing with Etelson (and with amicus curiae National Labor Relations Board Professional Association) that they do, for government and private litigators are simply lawyers on opposite sides of any given legal action. One generally attacks agency action; the other generally defends it against the selfsame attacks. The legal skills acquired in these pursuits are identical.

OPM has never offered any reason for its differing treatment of the two types of attorneys. In response to Mr. Etelson's complaints, the agency has consistently stated that government and private attorneys are evaluated differently, but it has never even hinted why. Government counsel in the case at bar, rather than offering reasons for the disparate treatment, has claimed that no such treatment exists, a contention with which we cannot agree. We have combed in vain through the administrative record, the additional record generated by the District Court, and the briefs in this court to find any explanation for the agency's discrimination between government and private lawyers.

Nor can we think of reasons that would justify the agency's action. Our experience as judges indicates the folly of a presumption, and especially an irrebuttable one, that government attorneys are inferior to their private counterparts. Nothing in the process of selection of government attorneys, or

in the process by which they come to court, would support such a presumption.[16] Government lawyers may have a narrower range of experience than private lawyers, for their client is likely always to be the same agency. But this suggests that, if anything, Etelson, as an NLRB lawyer seeking to become an NLRB ALJ, should be rated *higher* than a private applicant, for concomitant with his possibly narrow experience is a greater expertise in the single type of case he has litigated, namely, NLRB cases.

The ALJ selection system is a multifaceted one. It may, on the whole, work quite well in practice, and the agency has pointed to it with pride. *See* Dullea, *Development of the Personnel Program for Administrative Law Judges,* 25 Ad.L.Rev. 41 (1973); Macy, *The APA and the Hearing Examiner: Products of a Viable Political Society,* 27 Fed.B.J. 351 (1967). *But see* Miller, *The Tangled Path to an Administrative Judgeship,* 25 Lab.L.J. 3 (1974). The single aspect of the system discussed in this opinion, however—the application of different standards to government and private practitioners—is arbitrary and cannot stand.

### III. FACTOR RATINGS

■ We reject Etelson's contention that the agency acted arbitrarily in rating him "better than adequate" on Group II factors, *see supra* p. 921. Those who expressed opinions on Etelson's skills generally saw him as outstanding, but the agency could rationally conclude from the inability of most witnesses to comment on these skills that Etelson did not use them frequently in his work. It was not arbitrary for the agency to conclude that he was not outstanding in this area. On this point, the District Court is affirmed.

### IV. REMEDY

■ Although we hold for Mr. Etelson in part, he is not entitled to the relief he

---

**16.** The quality points aspect of the system, moreover, is aimed at measuring quality of *experience.* The quality of an applicant's *abilities* is measured in the factor ratings portion. If government attorneys are in fact inferior to

their private adversaries, this will surely result in lower factor ratings and lower total ratings, thereby ensuring that only the best qualified individuals are adjudged eligible for ALJ positions.

seeks: immediate certification as eligible to become a GS–16 ALJ. For very practical reasons, it would be inappropriate for us to order the agency so to certify him. The most recent information in the record pertains to Etelson's litigating experience in 1972 and 1973; that obviously has little bearing on his present capacity to serve as an ALJ. Perhaps more important, we do not require the agency hereafter to apply to government lawyers the criteria it has in the past applied to private ones. OPM may not continue to discriminate between those in public and those in private practice, but it is for the agency, applying its expertise and discretion, to determine in the first instance what nondiscriminatory criteria it will apply to both types of lawyers.

We therefore remand this case to the District Court with directions that it be remanded to OPM. The District Court shall instruct OPM to allow Etelson to update his application, and then to evaluate his application in a way that does not arbitrarily discriminate between government and private lawyers.

*Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.*

MacKINNON, Circuit Judge:

I concur in the result and much of the opinion. My main difficulty with the result we reach is that I believe there are some sound grounds for differentiating between government lawyers and lawyers in private practice, but the grading cannot be as arbitrary as was followed here. Lawyers in private practice work for many clients and their experience may be much broader than that of a lawyer for government agencies—most of whom are practicing in a specialized field. The broader experience can be a great asset to the specialist because it brings in legal concepts that do not occur to one who is restricting his practice to a narrow field. The level of compensation is another factor. The present system may work out to be fair on the average but applying an average system to people who are above average can be grossly unfair and

operate discriminatorily in certain cases. It penalizes those above average and overly benefits those below average. Some government lawyers at some levels of practice are superior to some lawyers in private practice and vice versa. The grading system, however, in my opinion must be based on factors that are more demonstrative of ability.